IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF ONE MOTOROLA CELLULAR TELEPHONE SEIZED BY LAW ENFORCEMENT DURING A SEARCH WARRANT ON OCTOBER 8, 2026 | Case No. 2:26-mj-00116 |

**AFFIDAVIT IN SUPPORT OF A SEARCH WARRANT**

I, Aaron M. Lee, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the extraction and examination of electronically stored information from a certain electronic communication device seized by law enforcement on October 8, 2026, during a search warrant executed on 111 Horseshoe Lane Sumerco, West Virginia, 25567. The device is more particularly described herein and in Attachment A and include one cellular telephone (hereinafter the "SUBJECT DEVICE"). The electronically stored information sought under this warrant is more particularly described herein and in Attachment B. The SUBJECT DEVICE is currently located at the Federal Bureau of Investigation, Charleston Resident Agency, 113 Virginia Street East, Charleston, West Virginia, 25301.

2. I am a Special Agent employed by the United States Department of Justice, the Federal Bureau of Investigation (hereinafter "FBI"), and as such I am a "federal law enforcement officer" within the meaning of Fed. R. Crim. P. 41(a)(2)(C) and am authorized to apply for federal search warrants. I have been employed as a Special Agent of the FBI since January

of 2019. I am currently assigned to the FBI Charleston Resident Agency, Charleston, West Virginia. During my employment with FBI, I have worked as a Special Agent and have been involved in several investigations which include matters of national security, drugs, and fraud. As part of my duties with the FBI, I investigate violations of federal law, including offenses enumerated in 21 U.S.C. § 841. I have been the affiant on search warrants, personally participated in executing search warrants, and made arrests. Prior to working for the FBI, I was employed as a Correctional Officer in the West Virginia Division of Corrections and the Federal Bureau of Prisons for more than three years. During my time as a Correctional Officer, I had experience in searching for contraband to include drugs.

3. Based on my training, experience, and conversations with other experienced drug investigators, I have gained knowledge in the techniques and methods used by drug traffickers to distribute controlled substances, their use of cellular phones and other electronic communication devices to facilitate their trafficking activity, and their methods used to conceal and launder the proceeds of said activity.

4. Among other duties, I am participating in an investigation with other law enforcement officers assigned to the Drug Enforcement Administration ("DEA") investigating the distribution of controlled substances by Gary Huffman (hereinafter "HUFFMAN"), his drug trafficking organization ("DTO"), and his involvement in animal fighting in and around Sumerco, Lincoln County, West Virginia, and within the Southern District of West Virginia.

5. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, law enforcement officers, and witnesses.

Summaries of recorded conversations are based on draft transcripts of those conversations. This affidavit is intended to show that there is probable cause for the requested warrant and does not set forth all my knowledge about this investigation.

## IDENTIFICATION OF THE DEVICE TO BE EXAMINED

6. The SUBJECT DEVICE is described as a black Motorola cellular telephone seized during the execution of the search warrant of HUFFMAN's residence on October 8, 2026. Photographed below:






7. The SUBJECT DEVICE is currently located at 113 Virginia Street East, Charleston, West Virginia, 25301. The applied-for warrant would authorize the forensic examination of the SUBJECT DEVICE for the purpose of identifying electronically stored data particularly described in Attachment B.

**PROBABLE CAUSE**

***A. Drug Investigation***

8. On April 28, 2026, investigators with the DEA received a tip regarding HUFFMAN and his illegal drug trafficking and cockfighting activities at his residence located at 111 Horseshoe Lane, Sumerco, West Virginia, 25567. The tip advised the following information:

> "Cock fighting activities and drug sales. HUFFMAN is raising game cocks and selling opioids. Cars are frequently going down to the house then leaving. Next door neighbor said he's selling his opioids to supplement his income. This activity is next to my elderly parent's home in Sumerco, West Virginia. My dad has MS and dementia the game cocks and drug traffic keep both my mom and dad up at night. Vehicles and buildings: Older Maroon full size truck. Older White full-size truck. Several barns."

9. SA Brumfield and Intelligence Research Specialist Michelle Shaffer spoke with the complainant on April 29, 2026, regarding the suspected drug activity of HUFFMAN. The complainant believes HUFFMAN is disabled and is possibly trafficking diverted opioids to fund his illegal cockfighting operation. HUFFMAN allegedly has 50-75 game chickens that are being used in the fighting operation.

10. On October 5, 2026, SA Brumfield received information from the DEA Columbus Office regarding Lawrence Seagraves, Jr. ("SEAGRAVES"). SEAGRAVES has been identified in multiple DEA federal cases as a bulk quantity dealer of cocaine, methamphetamine, and pills out of Columbus, Ohio. SA Brumfield was informed by DEA Special Agent Latwain Potter ("SA Potter") that on October 5, 2026, SEAGRAVES' known vehicle described as a White Utility Truck bearing OH License Plate, POG2378, was observed at HUFFMAN's residence via a tracker that was placed on the vehicle. On that same date, SA Potter also

observed SEAGRAVES geolocation data from SEAGRAVES' cellular device in the area of HUFFMAN's Residence as well.

11. The DEA Columbus Office further provided that investigators identified HUFFMAN's suspected phone number to be 304-246-3316. Investigators submitted an administrative subpoena to T-Mobile/Sprint. T-Mobile/Sprint provided a subpoena response indicating the telephone number is registered to Customer Name: Gary Huffman (no customer address provided). Upon review of the subpoena response, investigators identified the following phone numbers in contact with 304-246-3316, that were identified as having suspected users with drug related criminal convictions. A review of the subpoena showed the following:

- Phone Number 740-861-9735 – Suspected User Lawrence Seagraves, DOB: 08/29/1979. Mr. Seagraves plead guilty in 2021 to federal charges of distribution of Oxycodone and possession with intent to distribute controlled substances.
- Phone Number 304-838-0255 – Suspected User Brian Keith Terry, DOB: 11/16/1972. Mr. Terry plead guilty to possession of controlled substance charges in 2009.
- Phone Number 336-957-1818 – Suspected User Porter Jacob Cole Jr., DOB: 04/16/1950. Mr. Cole Jr. was convicted in 1994 of federal charges of conspiracy to manufacture and possession with intent to distribute marijuana.
- Phone Number 304-946-0199 – Suspected User Thomas S. Cooper, DOB: 12/13/1960. Mr. Cooper was convicted in 1993 of delivery of marijuana, LSD, and cocaine.
- Phone Number 681-254-9358 – Suspected User John Adkins, DOB: 03/08/1982. Mr. Adkins was convicted in 2005 of possession with intent to deliver a controlled substance.

12. On October 9, 2026, at approximately 2:53 P.M., SA Lee called HUFFMAN's suspected phone number while in possession of the SUBJECT DEVICE. When SA Lee called the suspected phone number the SUBJECT DEVICE showed an incoming call from the telephone number SA Lee was calling from.

13. Based on my training, experience, and the investigation thus far, probable cause exists that the SUBJECT DEVICE contains evidence of drug trafficking by HUFFMAN more fully described in Attachment B.

**B. <u>Animal Fighting Investigation</u>**

14. SA Brumfield and SA Lee are currently conducting a criminal investigation on HUFFMAN for a violation of the Animal Fighting Venture Prohibition Act. The elements of these offenses are:

<u>7 U.S.C. § 2156(a)(1) (Sponsoring or exhibiting an animal in an animal fighting venture)</u>:

(1) knowingly sponsor or exhibit

(2) an animal

(3) in an animal fighting venture.

The term "animal" means any live bird, or any live mammal, except man. (7 U.S.C. § 2156(f)(4)).

The term "animal fighting venture" means any event, in or affecting interstate or foreign commerce, that involves a fight conducted or to be conducted between at least 2 animals for purposes of sport, wagering, or entertainment (7 U.S.C. § 2156(f)(1)).

<u>7 U.S.C. § 2156(b) (Buying, selling, delivering, possessing, training, or transporting animals for participation in animal fighting venture)</u>:

(1) knowingly sell, buy, possess, train, transport, deliver, or receive

(2) an animal

(3) for purposes of having the animal participate in an animal fighting venture.

<u>7 U.S.C. § 2156(c) (Use of Postal Service or other interstate instrumentality for promoting or furthering animal fighting venture)</u>:

(1) knowingly use the mail service of the United States Postal Service or any instrumentality of interstate commerce

(2) for the purposes of promoting or in any other manner furthering an animal fighting venture.

The term "instrumentality of interstate commerce" means any written, wire, radio, television or other form of communication in, or using a facility of, interstate commerce (7 U.S.C. § 2156(f)(2)).

<u>7 U.S.C. § 2156(d) (Buying, selling, delivering, or transporting sharp instruments for use in animal fighting venture)</u>:

(1) knowingly sell, buy, transport, or deliver in interstate or foreign commerce

(2) a knife, a gaff, or any other sharp instrument attached, or designed or intended to be attached, to the leg of a bird for use in an animal fighting venture.

15. Cock fighters often participate in cockfighting "derbies," where large numbers of cock fighters will pit their roosters against one another for the entertainment of others and to enrich themselves. Cock fighting spectators gamble on the outcomes of the cock fights, and the owners of the animals stand to gain financially either through their own wagers, through an arrangement with the host of the cock fight, or through the enhanced value of their winning gamecocks.

16. Owners/operators of cock fighting arenas, called "pits," hold organized fights where many people can fight their trained birds against the fighting birds of other people. These arenas, depending on the level of sophistication, will have multiple pits to host "main

fights" and drag pits to accommodate fights in the main pit that have lasted too long and lost the interest of the spectators. These arenas will often have permanent stadium-style seating, electricity, plumbing, concessions, and ample parking for participants and spectators.

17. Owners charge participants a set fee to enter his or her birds into a derby. This fee may be anywhere from one hundred dollars to tens of thousands of dollars, depending on the event. The winner of the derby is the person whose birds have the best overall win/loss record. This person wins the "pot" or fees collected by the other participants. If multiple people tie with the best win/loss record, then the pot is split between them.

18. Owners enrich themselves by keeping a percentage of the pot, charging participants for extra "options" or "insurance" (which may increase a participant's chance of winning more money), charging spectators to park at the pit, charging a fee for spectators to get into the event, selling food and drinks at the event, selling gaffs and other bird fighting supplies, charging vendors to set up booths at the pit, charging premiums for preferred seating, charging annual rentals of VIP rooms at the pit location, and charging annual fees for bird keeps at the pit location. A keep is a wooden hut with multiple compartments to house and segregate a contestant's fighting birds while they attend the event.

19. Owners often have schedules professionally printed that show the dates of the fights that people can enter to participate and spectate. Owners distribute these schedules by various means such as social media, instant messaging apps, and word of mouth to enhance participation and attendance at their organized fights.

20. Cock fighters take pride in their gamecocks and breed them as others might breed nonfighting animals. Cock fighters select their animals for the traits they value – size, toughness, and aggression – and may enhance the performance of the animals using veterinary drugs. Cock fighters then train their gamecocks to fight, often to the death.

21. Persons engaged in cockfighting breed, buy, sell, and traffic in specialized strains of gamecocks bred specifically for cockfighting. These strains are called by names such as "Sweater" and "Claret," which refer to the "bloodline" of the bird. These bloodlines or strains of birds have been purposefully bred for cockfighting. Particular strains known for their winning records in cock fighting matches are prized by users. Since many cockfighters will "go through" dozens or even hundreds of birds a year competing at derbies, there is ample commerce in fighting birds between cockfighters.

22. Persons engaged in raising game fowl for cockfighting often house the birds in a unique manner. Since the gamecocks have been bred to fight, they must be separated. Therefore, gamecocks are kept in teepees, blue barrels, and/or small cages. The gamecocks are tied to the structure with a tie cord, which restricts the bird's range of movement and prevents it from attacking other birds. The owners sometimes use cages to house one gamecock with several hens. Flight pens are used to help train the gamecocks to fly. In a flight pen, the bird's food and water are placed above the ground, which forces the bird to fly to reach its food and drink. This is done to strengthen the bird for fighting.

23. Gamecocks have a naturally occurring bony spur on the back of their leg. This spur is used by the gamecock to cause injury to other animals when it kicks with its leg. This is the gamecock's primary means of inflicting injury. Cockfighters trim the bird's natural spur to the desired length to fit a boot with which a weapon, known as a "gaff" or "knife," is

equipped to enhance the bird's ability to cause more damage. Typical cockfights employ the use of these weapons that are attached to the backs of the birds' legs. The gaff is an icepick like implement that is strapped to both legs and designed to cause puncturing damage, while knives come in different sizes (short knife or long knife) and are designed to cause slashing or stabbing damage to the opponent bird. These weapons are also called long heels, short heels, jaggers, bayonets, Texas Twisters, socket knives, long knives, short knives, slashers, and postizas in other parts of the country and the world. These weapons are attached to a small, soft leather collar referred to as a "boot." The boot is used to hold the weapon which is then wrapped around the bird's ankle and fit by means of the boot's hole over the shaved down spur of the bird.

24. Due to the enhanced stabbing and slashing ability bestowed upon the birds by the manmade weapons, cockfighting is an extremely painful, bloody, and deadly event. Birds are stabbed, slashed open, eviscerated, and partially decapitated. Birds that lose a match most often die. It is not uncommon for winning birds to die shortly after a fight or be unable to continue because of mortal wounds.

25. Cockfighters further modify the gamecock by trimming the comb and wattle from the bird. The comb is located on the top of the gamecock's head, and the wattle is located on the bottom of the gamecock's head. The comb and the wattle help improve blood flow through the area. Increased blood flow helps the gamecock cool his own body when temperatures start to climb. Cockfighters remove the comb and wattle to prevent blood loss during the fight and to prevent blood from flowing into the gamecock's eyes during the fight. The process of cutting off the comb, and wattle is commonly referred to as "dubbing."

26. It can be challenging for cockfighters to find cockfighting venues and for that reason,

cockfighters rely heavily on each other and on extensive networks of contacts to find an opponent, which is typically done by telephone, text message, social media, e-mail, or other electronic communication. The use of electronic communications to facilitate cockfighting is an integral practice without which many cockfighting derbies could not occur.

27. Cockfighters today tend to communicate via email, text messages, social media, communication apps, or website chat rooms dedicated to scheduling matches and exchanging documents, tips, photographs, or videos relating to cockfighting activities.

28. Gamecock owners often maintain one or more cellular or "smart" telephones which contain information relating to their cockfighting activities. That information includes, but is not limited to, contact lists, lists of recent call activity, stored text and voice messages, and pictures and video.

29. It is common for those operating animal fighting ventures to maintain books, records, ledgers, and journals relating to the purchase, transportation, sale, breeding, and training of gamecocks. These materials occur in both hard and electronic copy. Animal fighters often maintain information regarding fighting activities in order to stay current with the cockfighting community. "Underground" cockfighting publications similar to magazines are routinely published and distributed to readers through periodic subscriptions, which describe and report on recent fight details and past results from around the country using coded language. These publications also describe various breeders who overtly raise gamecocks for animal fighting purposes. Furthermore, individuals that import, possess and sell the sharp fighting instruments (i.e. gaffs, knives, and/or any other sharp instrument) are involved with cockfighting, as the implements have no other use.

30. In May 2026, investigators conducted surveillance of HUFFMAN's residence. During surveillance, investigators located several individual huts with chickens. The chickens appeared to be chained by foot near their hut. Investigators also observed multiple large building structures with what appeared to be tin roofs near the huts. There appeared to be one chicken to each individual hut. See photographs below.

**Exhibit 1**



**Exhibit 2**



**Exhibit 3**



**Exhibit 4**




31. On July 22, 2026, SA Lee interviewed Kerry Matthews, Jr. ("MATTHEWS") telephonically regarding HUFFMAN's illegal activities. Below is a summary of the info MATTHEWS provided.

> MATTHEWS stated the game cocks could be heard all the time. MATTHEWS believed HUFFMAN was having buildings built to put game cocks in them. MATTHEWS stated that HUFFMAN was crippled and was selling his pain pills. MATTHEWS believed HUFFMAN was on opioids and selling his prescription to others. MATTHEWS knows this because years ago while shoveling snow they had discussed this information. It's been since April of 2026 or before since the last time HUFFMAN hosted cock fighting. MATTHEWS told the interviewer the fights happen more often during the wintertime. MATTHEWS stated that during the winter things "ramp up." MATTHEWS knows of an individual that feeds the game cocks every day.

32. On October 8, 2026, the DEA, FBI, and other law enforcement agencies executed a search warrant at HUFFMAN's residence. During the search of HUFFMAN's residence the following animal fighting evidence was observed:

- Gaffs and knives;
- Records of feeding and care for training purposes;
- Pamphlets and training manuals;
- Trophies and plaques;
- Carrying cases;
- Leads or tethers;
- Drugs or supplements, needles and syringes capable of being used for drug administration;
- Grinder wheel used for shaving the spur of the bird;
- Clippers used for "dubbing" or cutting the comb and wattle;
- Tackle box with fighting supplies; and
- Veterinary supplies.

33. Other visible items such as huts, tee pees, and blue barrels used to house chickens were discovered at HUFFMAN's residence. Approximately 100 chickens were on HUFFMAN's residence. The condition of the chickens varied with some showing visible signs of training and/or fighting with the comb and wattle removed, and spurs shaved down.

34. HUFFMAN has a drug related criminal history in West Virginia dating back to 1992 up to 2001. HUFFMAN's criminal history reflects federal convictions for Marijuana cultivation. The West Virginia Magistrate Court Portal reflects HUFFMAN was cited for chicken

fighting on May 22, 2022, in Lincoln County, West Virginia, by West Virginia State Police Senior Trooper Travis Hurley.

## TECHNICAL TERMS

35. Based on my training, experience, and conversations with other experienced drug investigators, I use the following technical terms to convey the following meanings:

- Cellular telephone: A cellular telephone (or mobile telephone, or wireless telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mails; taking, sending, receiving, and storing still photographs and moving videos; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

36. The SUBJECT DEVICE is a cellular telephone. In my training and experience, examining data stored on cellular telephones can uncover the relevant evidence described above as well as evidence identifying who used or possessed the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

37. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. The information would include but not be limited to text messages, multimedia messaging service ("MMS") messages, and encrypted messages to and from coconspirators over various applications like SnapChat, Instagram, and Facebook. Phone logs, usernames, GPS locations, and images are also stored on electronic devices. Similarly, things that have been viewed via the Internet are typically stored for some period on the device. This information can sometimes be recovered with forensics tools.

38. Based upon Your Affiant's training, experience, and discussions with other federal agents related to the investigation of illegal animal fighting offenses, your affiant knows that these illegal animal fights or events are commonly facilitated through the internet and websites. Your Affiant also knows that individuals involved in illegal animal fighting activity often use electronic devices such as cell phones, computers, and tablets in furtherance of their illegal activities. Such devices are used for the purchase of illicit items, tracking shipments, communicating with suppliers and customers, organizing fights or events, acquiring or disposing of fighting animals, discovering or acquiring new animal fighting venues, and a host of other activities.

39. As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described in the warrant, but also forensic evidence that establishes how the SUBJECT DEVICE was used, the purpose of its use, who used it, and when. There is probable cause

to believe that this forensic electronic evidence is stored within the memory of the SUBJECT DEVICE because:

- Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Forensic evidence on a device can also indicate who has used or controlled the SUBJECT DEVICE. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.
- A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.
- The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether electronically stored information is evidence may depend on other information stored on the device and the application of knowledge about how electronically stored data works. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.
- Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

## CONCLUSION

40. Based on the foregoing, and consistent with Rule 41(e)(2)(B), the applied-for warrant would permit the examination of the SUBJECT DEVICE consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

41. Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is probable cause for the Court to authorize execution of the warrant at any time in the day or night.

42. I submit that this affidavit demonstrates probable cause for a search warrant authorizing the examination of the SUBJECT DEVICE described in Attachment A to seek the information described in Attachment B.

Respectfully submitted,

Aaron Lee

Aaron M. Lee
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me by telephone pursuant to Fed. R. Crim. P. 41(d)(3)

On Oct. 19, 2026:

DWANE L. TINSLEY
UNITED STATES MAGISTRATE JUDGE